**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUSTIN MCGUIRE ) <br> 45619 Frank Hayden Lane ) <br> Great Mills, MD 20634 ) <br>                  **Plaintiff** ) <br>                       ) <br>     v.                    ) <br>                       ) <br> THE ARCHITECT OF THE CAPITOL ) <br> c/o General Counsel ) <br> Ford House Office Building H2-265A ) <br> Second and D Streets SW ) <br> Washington, DC 20515 ) <br>                  **Defendant** ) <br>                       ) | Civil Action No. 1:18-cv-00476 <br> (unassigned) |

**COMPLAINT**

Plaintiff, Justin McGuire, brings this civil action against Defendant, the Architect of the Capitol (AOC) because the AOC has discriminated against him for a variety of reasons including his disability (or perceived disability), his use of FMLA leave, and his protected workplace safety complaints. In addition to discrete (stand alone) conduct that is actionable on an individual basis, Mr. McGuire has also been subjected to a hostile work environment in violation of the Congressional Accountability Act.

**JURISDICTION**

1. Plaintiff invokes the jurisdiction of this Court pursuant to the Congressional Accountability Act of 1995 (2 U.S.C. §1408 (a)), as well as 28 U.S.C. § 1331 (Federal Question).

2. This is an action authorized and instituted pursuant to the Congressional Accountability Act, (2 U.S.C. § 1301 *et seq*.).

3. The unlawful employment practices alleged in this Complaint were committed in the

    District of Columbia.

4. Plaintiff is a current employee of the Architect of the Capitol.

5. Defendant Architect of the Capitol (AOC) is an "Employing Office" covered by the Congressional Accountability Act (2 U.S.C. § 1301(9)(D)).

6. AOC is headquartered in the District of Columbia.

7. The Congressional Accountability Act makes it unlawful for USCP to discriminate against employees based on, *inter alia*, their disability (or perceived disability) (2 U.S.C. § 1311), their use of Family Medical Leave Act (FMLA) (2 U.S.C. § 1312) leave or their protected workplace safety complaints (2 U.S.C. § 1341). The Act also makes it unlawful for the AOC to "intimidate, take reprisal against, or otherwise discriminate against, any covered employee because the covered employee has opposed any practice made unlawful by [the] Act." 2 U.S.C. § 1317.

8. Plaintiff has satisfied all administrative and judicial prerequisites to the institution of this action. The Plaintiff filed a timely Request for Counseling at the Office of Compliance, on September 14, 2017 within 180 days of the discriminatory conduct at issue here. Plaintiff's request for counseling raised the violations of the Congressional Accountability Act complained of here. Plaintiff engaged in the counseling process and filed a timely Request for Mediation at the conclusion of the Counseling Period, on October 19, 2017. Plaintiff files this suit within the time limits defined by the Act (i.e. after the expiration of 30 days from the end of the Mediation Period, and before the expiration of 90-days, following the end of the Mediation Period, which was December 15, 2017).

**FACTS**

9.  Plaintiff has been employed at the Architect of the Capitol since December 2008.

10. In December 2008, Plaintiff began his career as an electrician in the Senate jurisdiction. Plaintiff applied for and attained position as a WG-12 High Voltage Electrician in the AOC Power Plant in February 2010.

11. At all relevant times to this complaint, up through August 2017, Plaintiff worked a rotating shift, which resulted in his working three consecutive days on the day shift, followed by three days on the night shift.  Additionally, during that period, Plaintiff was regularly assigned/required to work four hours of overtime each two-week period.

12. When Plaintiff worked the night shift, on the rotation mentioned above, he was paid a 10% nighttime differential.

13. At all relevant times to this complaint, up through approximately August 2017, Plaintiff suffered from a sleep disorder that was diagnosed as narcolepsy.

14. Plaintiff never had a narcoleptic episode at any time he was performing electrician work.  Instead, narcoleptic episodes would occur during breaks or long meetings.

15. In his performance evaluations, Plaintiff's supervisor has recognized that Plaintiff takes precautions to ensure that his medical condition does not create safety hazards. For example, in his March 2016 evaluation, Electrical Division Supervisor Phil Swider stated that Plaintiff "understands unsafe or hazardous conditions and takes necessary actions to alleviate identified problem areas in a timely manner."

16. Mr. McGuire received formal and informal accommodations over his tenure at the AOC.  The most recent formal accommodation, dated April 13, 2015, permitted him

     to:

    a. During meetings or training sessions:

        i. Stand up to try to stay awake;

        ii. Move to back of room and move around;

        iii. Exit room for short periods and move around to wake and then return;

    b. During work hours:

        i. Stop your work and walk around to wake up;

        ii. Find your supervisor and request unscheduled leave to get some rest;

    c. During shift work hours:

        i. Stop your work and walk around to wake up;

        ii. Find your supervisor and request unscheduled leave to get some rest.

17. The April 12, 2015 accommodation superseded and replaced a longstanding informal accommodation (adopted by Mark Weiss) whereby Mr. McGuire's supervisor allowed him to avoid long meetings and remain busy in order to avoid narcoleptic events and to doze of for brief periods during breaks and downtime.

18. Notwithstanding the formal and informal accommodations, the AOC disciplined Plaintiff on numerous occasions for having narcoleptic events while at work (albeit never in a situation that caused any danger to himself, others or to property).

    a. In October 2014, Chris Potter (Director of the Utilities and Power Plant Operations Division) suspended Plaintiff for two days as a result of a narcoleptic event.

    b. Plaintiff has been issued numerous (more than 10) Incident Reports for sleeping while on duty in the past 8 years.

    c. Plaintiff has been issued several (at least three) letters of reprimand for sleeping while on duty, the most recent of which was issued to Plaintiff in approximately May 2017.

    d. On or about March 31, 2016, Phil Swider (Electrical Division Supervisor) issued Plaintiff a "Fully Successful" Performance Evaluation, stating "Justin has fallen asleep on several occasions on the job-site. He has received letters of reprimand on this matter & has been suspended once." Plaintiff should have received an "outstanding" and would have received an Outstanding but for his supervisors' animus toward him because of his sleep disorder.

    e. On August 1, 2017 Plaintiff was issued an incident report for allegedly sleeping while on duty on July 26, 2017. The incident report was issued at the behest of Paul Jagoda, the Lead Engineer for the Utilities and Power Plant Operations Division.

    f. Additionally, in early August 2017, Mr. Jagoda falsely accused Plaintiff of sleeping when he was working in a tunnel.

19. In approximately April 2017, PEPCO replaced a high voltage line in the Capitol Power Plant. After the line was replaced, Plaintiff's supervisor instructed Plaintiff to connect the new line to switchgear that a contractor had installed, but had not yet tested. Plaintiff refused to connect the switchgear because he reasonably believed that it was unsafe to do so, and that connecting the gear to the new line could lead to the death and/or severe injury of himself and other Power Plant employees.

20. Plaintiff's supervisors, including David Jagoda and Jim O'Keefe, were angry about Plaintiff's refusal to connect the untested equipment.

21. Mr. McGuire took approved FMLA leave between May 2017 and July 2017 in order to have heart surgery to repair damage to his aorta. Plaintiff's scheduled return to work date was to be July 19, 2017 and his maximum FMLA leave would have been through July 25, 2017.

22. For approximately two weeks prior to the July 19, 2017 return to work date, Plaintiff attempted to coordinate with the AOC to make sure that he had all of the necessary paperwork to support his return to work.

23. During the two weeks prior to his scheduled return, the AOC informed Mr. McGuire that there was no required paperwork for his return to work and that he only needed to provide a note from his physician clearing him to return.

24. On July 17, 2017, Mr. McGuire's cardiologist (Varkey Mathew, MD) issued a report indicating that Mr. McGuire was cleared to return to work.

25. Despite being cleared by his Doctor, the AOC would not permit Plaintiff to return to work and the Operations Division managers and staff issued him confusing and inconsistent directives, including about what documentation he was required to complete and whether he needed to undergo a fitness for duty exam.

26. On information and belief, the AOC was creating obstacles to block Mr. McGuire's return to work in order to exhaust his approved FMLA leave (which would have expired on July 25, 2017), so that the AOC would have a facially valid justification to terminate Mr. McGuire.

27. On or about July 19, 2017, Plaintiff contacted George Davis and Corniece Brown (AOC Dispute Resolution Specialist in the Diversity, Inclusion and Dispute Resolution Office) and advised them that the AOC was creating obstacles that

blocked his return to work.

28. The following day, July 20, 2017, the AOC approved Plaintiff to return to work, and Plaintiff returned to work sometime between July 20 and July 24, 2017.

29. When Plaintiff returned to work in July 2017, it was not to his former position working the rotating shift. Instead, he was assigned to the day shift, with no nighttime differential and no overtime. Another employee had been hired or promoted to take Plaintiff's position on the rotating shift.

30. On July 24, 2017, Plaintiff contacted Corniece Brown again, and he advised her that he had not been restored to his position. On information and belief, Ms. Brown contacted Plaintiff's supervisor(s) in the Capitol Power Plant and required them to return Plaintiff to his shift position as of August 9, 2017.

31. On August 8, 2017 AOC required Plaintiff to undergo a medical surveillance exam, with Dr. Karen Singleton, MD, who is under contract with the AOC to perform such exams.

32. On information and belief, on or about August 8, 2017, at the behest of the AOC, Dr. Singleton incorrectly issued a report or recommendation to the AOC stating that Plaintiff was not fit to return to duty due to circumstances related solely to Plaintiff's cardiovascular and pulmonary health and not his sleep disorder.

33. AOC failed to restore Plaintiff to his shift rotation. Instead, since his return on or about July 20, 2017 Plaintiff has been placed on "light duty" primarily checking light bulbs and emergency exit lighting.

34. On August 21, 2017 Plaintiff's cardiologist (Dr. Mathew, MD) completed an AOC Medical Certification Form that cleared Plaintiff to "perform work of any kind" and

7

stated that Plaintiff was able to perform all of the essential functions of his position.

35. On information and belief, at AOC's prompting, on September 8, 2017, the AOC's contract physician issued a "Fitness for Duty Report." This time Dr. Singleton declared that Plaintiff was not fit to perform the work of a high voltage electrician – based solely on the sleep disorder that the AOC had known about for approximately the prior eight years, and not the cardiovascular and pulmonary conditions on which her August 8, 2017 were allegedly premised. Dr. Singleton listed numerous restrictions on Plaintiff's ability to work, which rendered it impossible for Plaintiff to perform the work of a high voltage electrician. For example, among other restrictions, Dr. Singleton stated that Plaintiff was prohibited from "operation of hazardous equipment or work[ing] in the immediate vicinity of hazardous equipment." This rendered it impossible for Plaintiff to perform the work of a high voltage electrician in the Capitol Power Plant because all or nearly all of the equipment in the Capitol Power Plant is hazardous.

36. Dr. Singleton's restrictions were not based on any detailed medical examination or diagnosis.

37. On September 15, 2017 Corniece Brown (AOC Dispute Resolution Specialist in the Diversity, Inclusion and Dispute Resolution Office) contacted Plaintiff to advise him about the process to request an accommodation for any disability. Plaintiff stated he would consider whether he needed to request an accommodation.

38. On September 27, 2017, Plaintiff's general physician declared Plaintiff "cleared for full duty."

39. On information and belief, on October 5, 2017, Jim O'Keefe (Deputy Director of the

Utilities and Power Plant Operations) prompted Corniece Brown to again inquire if Plaintiff wished to request an accommodation.

40. Plaintiff did not request an accommodation.

41. On information and belief, on October 18, 2017, even though Plaintiff never requested an accommodation and his physician had cleared him to return to work, Jim O'Keefe prompted Liz Buday – the Director of the Diversity, Inclusion and Dispute Resolution Office – to declare that the AOC could not accommodate Plaintiff in his position as a high voltage electrician and declared that there were no open positions for him anywhere in the entire Architect of the Capitol.

42. On information and belief, at Jim O'Keefe's prompting, Ms. Buday advised Mr. McGuire that he may be eligible for disability retirement benefits – an indication that he would be removed from his position because of the conclusion that the AOC could not accommodate him (despite the fact that he did not ask for an accommodation and his physicians disagreed with the fitness for duty assessment).

43. On October 31, 2017, Mr. McGuire responded to the denial of accommodation, stating that he had not adopted or requested any of the accommodations that were listed in Dr. Singleton's report.

44. On March 12, 2017, Mr. McGuire's supervisors instructed to request a 45-day extension on whatever accommodation was in place at that time.

## COUNT I: DISCRIMINATION BASED ON DISABILITY

45. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

46. Defendant AOC violated the Congressional Accountability Act because it removed

9

      Plaintiff from his rotating shift assignment and placed him on the day shift with no overtime because of his disability, record of disability or perceived disability.

47. As a result of the AOC's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income, in the approximate amount of $500.00 per pay period and lost retirement credit and future income.

48. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

## COUNT II: DISCRIMINATION BASED ON FMLA USAGE AND OPPOSITION TO FMLA DISCRIMINATION

49. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

50. Defendant AOC violated the Congressional Accountability Act because it removed Plaintiff from his rotating shift assignment and placed him on the day shift with no overtime because of his use of FMLA leave between May and July 2017.

51. In addition, or in the alternative, Defendant AOC violated the Congressional Accountability Act because it removed Plaintiff from his rotating shift assignment and placed him on the day shift with no overtime because he complained about the AOC's FMLA discrimination to one or more member of the AOC's Diversity, Inclusion and Dispute Resolution Office

52. As a result of the AOC's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income, in the approximate amount of $500.00 per pay period and lost retirement credit and future income.

53. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and

suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

### COUNT III: RETALIATION FOR PROTECTED WORKPLACE SAFETY COMPLAINT

54. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

55. Defendant AOC violated the Congressional Accountability Act because it removed Plaintiff from his rotating shift assignment and placed him on the day shift with no overtime because of his protected workplace safety conduct and complaint (refusing to connect the untested switchgear to the new high voltage line in April 2017).

56. As a result of the AOC's unlawful conduct, Plaintiff has suffered substantial economic damages, in the form of lost income, in the approximate amount of $500.00 per pay period and lost retirement credit and future income.

57. As a result of the AOCs unlawful conduct, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

### COUNT IV: HOSTILE WORK ENVIRONMENT

58. Plaintiff repeats and reavers each of the foregoing paragraphs as if they were specifically restated here.

59. Defendant AOC violated the Congressional Accountability Act because it imposed on Plaintiff a hostile work environment, including the conduct referenced above, including numerous instances of discipline, including letters of reprimand and a suspension, the removal of Plaintiff from his rotating shift assignment, placing him on the day shift with no overtime, repeatedly requiring him to complete and submit

      unnecessary medical forms, repeatedly requiring him to endure medical visits with the AOC contract physician, imposing work restrictions under the guise of an accommodation that he did not request and that were not necessary, and placing him in fear of losing his position.

60. The hostile work environment was targeted at Plaintiff because of his disability (including record of disability and perceived disability), his use of FMLA and opposition to FMLA discrimination, and his protected workplace safety complaint.

61. As a result of the hostile work environment, Plaintiff has suffered emotional pain and suffering, stress, fear, embarrassment, humiliation, inconvenience, feelings of depression and anxiety and fear of losing his job.

WHEREFORE, Plaintiff prays that this Court: (i) declare that the employment practices complained of in this Complaint are unlawful in that they violate the Congressional Accountability Act; (ii) permanently enjoin the Defendant and its agents, officers and employees from engaging in all practices found by this Court to be in violation of the Congressional Accountability Act; (iii) order the Defendant to make the Plaintiff whole by paying him any monetary damages proved at trial in addition to compensatory damages in an amount to be determined at trial; (iv) retain jurisdiction over this action to ensure full compliance with the Court's orders and require the Defendant to file such reports as the Court deems necessary to evaluate such compliance; (v) order the Defendant to pay Plaintiff's costs and expenses and reasonable attorneys' fees in connection with this action; and (vi) grant such other and further relief to the Plaintiff as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully Submitted,
ALDERMAN, DEVORSETZ & HORA, PLLC

Leslie D. Alderman III (D.C. # 477750)
1025 Connecticut Ave., NW
Suite 615
Washington, DC 20036
Tel: 202-969-8220
Fax: 202-969-8224
lalderman@adhlawfirm.com
Attorney for the Plaintiff